UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

BINIKA L. HANKTON                                  CIVIL ACTION

VERSUS                                             NO. 17-11362

FREDERICK BOUTTE, WARDEN                           SECTION "A"(2)

## REPORT AND RECOMMENDATION

This matter was referred to a United States Magistrate Judge to conduct hearings, including an evidentiary hearing, if necessary, and to submit proposed findings and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C), and as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases.  Upon review of the entire record, I have determined that a federal evidentiary hearing is unnecessary.  See 28 U.S.C. § 2254(e)(2).[1]  For the following reasons, I recommend that the instant petition for habeas corpus relief be DENIED AND DISMISSED WITH PREJUDICE.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

On January 14, 2010, Hankton was charged in a grand jury indictment with the first degree murder of 76-year-old Henry Barber.[2]  She filed a pretrial motion in the state trial

---

[1]  Under 28 U.S.C. § 2254(e)(2), whether to hold an evidentiary hearing is a statutorily mandated determination.  Section 2254(e)(2) authorizes the district court to hold an evidentiary hearing only when the petitioner has shown either that the claim relies on a new, retroactive rule of constitutional law that was previously unavailable, 28 U.S.C. § 2254(e)(2)(A)(i), or the claim relies on a factual basis that could not have been previously discovered by exercise of due diligence, 28 U.S.C. § 2254(e)(2)(A)(ii); and the facts underlying the claim show by clear and convincing evidence that, but for the constitutional error, no reasonable jury would have convicted the petitioner. 28 U.S.C. § 2254(e)(2)(B).

[2]  State Rec. Vol. 1 of 13, Indictment, 1/14/10.

court to suppress her statements and other evidence.[3] The state trial court conducted a full

evidentiary hearing and denied the motion to suppress on May 28, 2010.[4] Hankton sought

pretrial supervisory appellate review of the denial of her motion to suppress, but both the

Louisiana Court of Appeal for the Fourth Circuit and the Louisiana Supreme Court denied

her writ of review applications.[5]

The Louisiana Fourth Circuit summarized the facts determined at trial in relevant

part as follows:

> On September 17, 2009, Henry Barber was found stabbed to death in his home at 2018 St. Andrew Street, Apt. B, in New Orleans. The defendant, Binika Hankton, was the person who reported Mr. Barber missing to the police, leading to the discovery of Mr. Barber's body.
>
> According to the evidence adduced at trial, on September 15, 2009, Ms. Hankton spent most of the day with Mr. Barber, who employed her for various domestic work. Ms. Hankton also had a personal relationship with the victim. The following day (September 16, 2009), allegedly unable to reach the victim by telephone, Ms. Hankton went to his apartment, where she found his mail and newspaper uncollected. That evening, Ms. Hankton contacted the New Orleans Police Department ("NOPD").
>
> NOPD Officer Christopher Harris met Ms. Hankton at Mr. Barber's apartment on the evening of September 16, 2009. Unable to gain entry to the apartment, Officer Harris and Ms. Hankton walked around the outside of the apartment but were unable to locate Mr. Barber. Officer Harris did not believe there was sufficient justification to force his way into the apartment.
>
> The following morning (September 17, 2009), Ms. Hankton again contacted the NOPD over her concerns for Mr. Barber. She likewise contacted the manager of Mr. Barber's apartment complex, Stanley Meyers,

---

[3] Id., Motion to Suppress Evidence, Statement and Identification and Motion to Preserve Evidence, 1/22/10.

[4] Id., Hearing on Motions, 5/28/10.

[5] State Rec. Vol. 12 of 13, Denial of Writ by La. App. 4th Cir., 7/16/10; State Rec. Vol. 13 of 13, Denial of Writ by La. S.C., 8/5/10.

who testified that he also received a call from the NOPD that day asking for assistance at Mr. Barber's apartment.  Mr. Myers did not have a duplicate key and called a locksmith to the apartment.  When he entered the apartment, he saw blood on the floor in the hallway and could see a leg hanging off of the bed in the bedroom.  He immediately withdrew from the apartment and contacted the NOPD.

NOPD Homicide Detective Greg Hamilton testified that he was the first detective to arrive at Mr. Barber's home.  NOPD officers were already at the scene and had located Mr. Barber's body.  Through information gathered by the other officers, he learned that Ms. Hankton had reported her concern for Mr. Barber and had made various inquiries regarding his well-being to others at Mr. Barber's apartment complex.  Detective Hamilton called Ms. Hankton from the murder scene asking to speak with her, as the last person known to have seen Mr. Barber.  Ms. Hankton expressed willingness to cooperate in the investigation; and Detective Hamilton dispatched a unit to pick up Ms. Hankton and to bring her, along with her two young children, to the police station in order for her to be interviewed.

Ms. Hankton gave an initial statement to Detective Hamilton and Lead Detective Desmond Pratt around 2:30 or 3:00 that afternoon, in which she described the events that took place on the last day she saw Mr. Barber (September 15, 2009).  She indicated that the morning consisted of running errands with Mr. Barber, after which she cooked for him, and that when she left his apartment that afternoon, he was "fine."  According to Detective Hamilton, at the time of this initial statement, Ms. Hankton was not a suspect in the murder, and as such, was not advised of her Miranda rights.

During the time that Ms. Hankton spoke with Detectives Hamilton and Pratt, detectives were interviewing other witnesses and gathering evidence in connection with the investigation.  Both Detectives Pratt and Hamilton testified that some inconsistencies were discovered as a result of those other witnesses' interviews and accordingly, they sought a second interview with Ms. Hankton.  These inconsistencies related to Ms. Hankton's activities on [] September 15, 2009 that she had not related to them, including that she had gone with a male friend, Sherman Gillum, to buy some crack cocaine.  Detective Hamilton testified that at the time of the second interview, Hankton was still not a suspect and she was not "limited to the room or handcuffed to a chair."  Ms. Hankton, too, testified she was free to go about at the police station during this time, and she visited with her children who were being watched by her aunt and uncle.

When the second interview with Ms. Hankton began in the early morning of September 18, 2009, Ms. Hankton stated at the outset "I'm going to tell you the truth."  Ms. Hankton then related that the last time she was

with Mr. Barber, she backed into him as he was shaving and he cut himself. Believing that "this thing was not making sense," Detective Hamilton stopped the interview, advised Ms. Hankton of her constitutional rights and obtained a signed waiver of rights from her. He then obtained Ms. Hankton's statement, which was videotaped. The videotape was played for the jury at trial. The videotaped statement given by Ms. Hankton essentially mirrored what Ms. Hankton had previously stated–that after she "fed" Mr. Barber, she wiped the table and then took him to the bank. When they returned to Mr. Barber's apartment, he stated that he was "hurting real real bad" and advised that he was going to lie down. She told him that she was going to go home, but before she did, she vacuumed the living room. At that point, Mr. Barber was "pulling hairs" in the area of his neck or nose with a sharp object (she could not identify). As she backed up, she inadvertently hit Mr. Barber causing him to puncture his throat with the sharp object he was using. Mr. Barber reportedly advised that he was all right, and Ms. Hankton noticed only a drop or so of blood. Assuring Ms. Hankton that he was fine, Mr. Barber went to lie down. The last time Ms. Hankton saw Mr. Barber was when he rose to close the front door as she left.

Ms. Hankton was not charged with Mr. Barber's murder after the second statement had been concluded. However, the subsequently received autopsy results revealed that Mr. Barber had been stabbed some 21 times to his neck, head, chest and torso, and Ms. Hankton was then charged with the first degree murder of Mr. Barber.

State v. Hankton, 140 So.3d 398, 402-3 (La. App. 4th Cir. 2014) (emphasis added); State Record Volume 2 of 13, Louisiana Fourth Circuit Court of Appeal Opinion, 2012–KA–0466, pages 2-3, April 30, 2014.

Jury trial commenced on August 30, 2011, and the jury found Hankton guilty as charged on September 1, 2011.[6] She was sentenced on October 20, 2011, to life in prison without benefit of parole, probation or suspension of sentence.[7]

---

[6] State Rec. Vol. 1 of 13, Trial Minute Entries, 8/30/11-9/1/11.

[7] Id., Sentence of the Court, 10/20/11.

Hankton filed a timely direct appeal to the Louisiana Fourth Circuit Court of Appeal, challenging – among other things – the sufficiency of the evidence to support her conviction and the trial court's denial of her motion to suppress her statements.[8]  The Fourth Circuit affirmed her conviction and sentence on April 30, 2014.[9]  Subsequently, she timely filed a writ application in the Louisiana Supreme Court, which denied relief on March 13, 2015.[10]

Within five months, Hankton filed an application for post-conviction relief in the state trial court.[11]  She argued that the evidence at trial was insufficient to support her conviction, that the state trial court had erroneously denied her motion to suppress her statements to police, and that her trial counsel had provided ineffective assistance by failing to re-urge a motion to transfer venue during or after voir dire examination.  The trial court denied relief on October 12, 2015.[12]  Her subsequent application for review by the Louisiana Fourth Circuit was denied on November 16, 2015.[13]  Her request for further review by the Louisiana Supreme Court was denied on August 4, 2017.[14]

---

[8] Id., Original Brief of Appellant, 8/22/12.

[9]  Id., La. 4th Cir. App. Affirmation of Criminal Appeal, 4/30/14.

[10] State Rec. Vol. 13 of 13, Writ Application, 5/21/14; State Rec. Vol. 1 of 13, La. S.C. Denial of Writ Application, 3/13/15.

[11] State Rec. Vol. 1 of 13, Application for Post Conviction Relief, 8/4/15.

[12] State Rec. Vol. 2 of 13, Supervisory Writ Denial, 10/12/15.

[13] Id., Supervisory Writ Denial, 11/16/15.

[14] Id., Supervisory Writ Denial, 8/4/17.

II.    FEDERAL HABEAS PETITION

On October 27, 2017, Hankton filed this federal habeas corpus petition in this court in which she asserts the following grounds for relief: (1) The evidence was insufficient to support her conviction. (2) Her counsel provided ineffective assistance in failing to re-urge a motion to change venue after voir dire was completed. (3) She was denied a fair trial when the court allowed the prosecution to use inculpatory statements against her at trial.[15]

III.   GENERAL STANDARDS OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, comprehensively revised federal habeas corpus legislation, including 28 U.S.C. § 2254.  The AEDPA went into effect on April 24, 1996[16] and applies to habeas petitions filed after that date.  Flanagan v. Johnson, 154 F.3d 196, 198 (5th Cir. 1998) (citing Lindh v. Murphy, 521 U.S. 320 (1997)).  The AEDPA therefore applies to Hankton's petition, which was filed on October 27, 2017.  The threshold questions in habeas review under the amended statute are whether the petition is timely and whether petitioner's claims were adjudicated on the merits in state court; i.e., the petitioner must have exhausted state court remedies and must not be in "procedural default" on a claim. Nobles v. Johnson, 127 F.3d 409, 419-20 (5th Cir. 1997) (citing 28 U.S.C. § 2254(b), (c)).

---

[15]Record Doc. No. 1.

[16]The AEDPA, which was signed into law on that date, does not specify an effective date for its non-capital habeas corpus amendments. Absent legislative intent to the contrary, statutes become effective at the moment they are signed into law. United States v. Sherrod, 964 F.2d 1501, 1505 (5th Cir. 1992).

In its response, the State concedes that the petition was timely filed, that all of Hankton's federal claims and arguments were exhausted in the state courts, and that none of the claims are in procedural default barring federal habeas review.  As a substantive matter unrelated to procedural default, the State argues that Hankton's Fourth Amendment claim concerning the use of inculpatory statements against her is barred by applicable Supreme Court precedent.[17]   I find the State's conclusions concerning timeliness, exhaustion and lack of procedural default supported by the record.  Accordingly, the claims will be evaluated on the merits under applicable constitutional precedent.

IV.   STANDARDS OF A MERITS REVIEW

28 U.S.C. §§ 2254(d)(1) and (2) contain revised standards of review for questions of fact, questions of law and mixed questions of fact and law in federal habeas corpus proceedings.  Nobles, 127 F.3d at 419-20 (citing 28 U.S.C. § 2254(b) and (c)).

Determinations of questions of fact by the state court are "presumed to be correct . . . and we will give deference to the state court's decision unless it 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'"  Hill v. Johnson, 210 F.3d 481, 485 (5th Cir. 2000) (quoting 28 U.S.C. § 2254(d)(2)), cert. denied, 532 U.S. 1039 (2001).  The amended statute also codifies the "presumption of correctness" that attaches to state court findings of fact and the "clear and

---

[17] Record Doc. No. 15 (Defendant's Response to Petition at pp. 4, 15).

- 7 -

convincing evidence" burden placed on a petitioner who attempts to overcome that presumption.  28 U.S.C. § 2254(e)(1).

A state court's determination of questions of law and mixed questions of law and fact are reviewed under 28 U.S.C. § 2254(d)(1) and receive deference, unless the state court's decision "'was contrary to, or involved an unreasonable application of, clearly established [Supreme Court precedent.]'" Penry v. Johnson, 215 F.3d 504, 507 (5th Cir. 2000) (quoting Miller v. Johnson, 200 F.3d 274, 280-81 (5th Cir.), cert. denied, 531 U.S. 849 (2000)), aff'd in part, rev'd in part on other grounds, 532 U.S. 782 (2001); Hill, 210 F.3d at 485.  The United States Supreme Court has clarified the Section 2254(d)(1) standard as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.   Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

Williams v. Taylor, 529 U.S. 362, 405-06, 412-13 (2000); Penry v. Johnson, 532 U.S. 782, 792-93 (2001);  Hill, 210 F.3d at 485.  The "critical point" in determining the Supreme Court rule to be applied "is that relief is available under § 2254(d)(1)'s unreasonable-application clause if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question." (citation omitted)  White v. Woodall, 134 S. Ct. 1697, 1706-07 (2014) (citing

Harrington v. Richter, 562 U.S. 86, 103 (2011)), and Knowles v. Mirzayance, 556 U.S. 111, 122 (2009)).  "Thus, 'if a habeas court must extend a rationale before it can apply to the facts at hand,' then by definition the rationale was not 'clearly established at the time of the state-court decision.'" White, 134 S. Ct. at 1706 (quoting Yarborough v. Alvarado, 541 U.S. 652, 666 (2004)).

"'A federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state court decision applied [a Supreme Court case] incorrectly.'" Price v. Vincent, 538 U.S. 634, 641 (2003) (quoting Woodford v. Visciotti, 537 U.S. 19, 24-25 (2002)) (brackets in original); Bell v. Cone, 535 U.S. 685, 699 (2002). Rather, under the "unreasonable application" standard, "the only question for a federal habeas court is whether the state court's determination is objectively unreasonable." Neal v. Puckett, 286 F.3d 230, 246 (5th Cir. 2002), cert. denied, sub nom, Neal v. Epps, 537 U.S. 1104 (2003).  The burden is on the petitioner to show that the state court applied the precedent to the facts of his case in an objectively unreasonable manner.  Price, 538 U.S. at 641 (quoting Woodford, 537 U.S. at 24-25); Wright v. Quarterman, 470 F.3d 581, 585 (5th Cir. 2006).

V.     PETITIONER'S CLAIMS

(A)    SUFFICIENCY OF THE EVIDENCE

Hankton argues that the evidence presented against her at trial was insufficient to convict her because it consisted of "speculation and illegally obtained statements that were

worded by others to sound inculpative."[18]  Specifically, she asserts that no blood was found on the knife that was presented at trial as the murder weapon.  She argues further that a telephone presented as evidence at trial "was not inspected or its origin investigated" and that the victim "would have tried to defend himself" from a knife attack, "yet no DNA was found under his fingernails" and "no DNA was searched for under the victim's fingernails or on his person."[19]  She asserts that she was convicted based upon "evidence that could only be classified as circumstantial at best, . . ."[20]

Hankton's counsel asserted this claim on direct appeal to the Louisiana Fourth Circuit.  Relying on the standards set forth in Jackson v. Virginia, 443 U.S. 307 (1979), and related state law, the court reviewed the testimony and evidence and found that there was sufficient evidence to sustain the conviction on the charge and that the jury acted reasonably in assessing the evidence.  This was the last reasoned state court opinion on the issue.  Ylst v. Nunnemaker, 501 U.S. 797, 802 (1991); see Wilson v. Sellers, __U.S. __, 138 S.Ct. 1188, 2018 WL 1800370, at *3 (Apr. 17, 2018) ("We hold that the federal court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale . . . then presume that the unexplained decision adopted the same reasoning.").

[18] Record Doc. No. 1 at p. 5.

[19] Id.

[20] Id. at p. 16.

Under Jackson, a federal habeas court addressing an insufficiency of the evidence claim must determine, after viewing the evidence in the light most favorable to the prosecution, whether a rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt.  Jackson, 443 U.S. at 319; Perez v. Cain, 529 F.3d 588, 594 (5th Cir. 2008); Williams v. Cain, 408 F. App'x 817, 821 (5th Cir. 2011).  To determine whether the guilty verdict is adequately supported by the evidence, the court must review the substantive elements of the crime as defined by state law.  Perez, 529 F.3d at 594 (citing Jackson, 443 U. S. at 324 n.16). The court's consideration of the sufficiency of the evidence extends only to what was presented at trial.  See McDaniel v. Brown, 558 U.S. 120, 131, 134 (2010) (recognizing that a reviewing court must consider the trial evidence as a whole under Jackson); Johnson v. Cain, 347 F. App'x 89, 91 (5th Cir. 2009) (Jackson standard relies "upon the record evidence adduced at the trial") (quoting Jackson, 443 U.S. at 324).

Review of sufficiency of the evidence, however, does not include review of the weight of the evidence or the credibility of witnesses, because those determinations are the exclusive province of the jury.  United States v. Young, 107 F. App'x 442, 443 (5th Cir. 2004) (citing United States v. Garcia, 995 F.2d 556, 561 (5th Cir. 1993)); see Jackson, 443 U.S. at 319 (it is the jury's responsibility "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts").  A reviewing federal habeas court is not authorized to substitute its interpretation of the evidence or its view of the credibility of witnesses in place of the fact-finder.  Weeks v.

Scott, 55 F.3d 1059, 1062 (5th Cir. 1995); Alexander v. McCotter, 775 F.2d 595, 598 (5th

Cir. 1985).  Thus, all credibility choices and conflicting inferences must be resolved in

favor of the verdict.  Ramirez v. Dretke, 398 F.3d 691, 695 (5th Cir. 2005).  In addition,

"[t]he Jackson inquiry 'does not focus on whether the trier of fact made the correct guilt or

innocence determination, but rather whether it made a rational decision to convict or

acquit.'"  Santellan v. Cockrell, 271 F.3d 190, 193 (5th Cir. 2001) (quoting Herrera v.

Collins, 506 U.S. 390, 402 (1993)).

      "The Government may prove its case through direct or circumstantial evidence, and

the jury may chose among reasonable constructions of the evidence." United States v. Page,

No. 16-41174, 2018 WL 2068685, at *3 (5th Cir. May 2, 2018) (citing United States v.

Mitchell, 484 F.3d 762, 768 (5th Cir. 2007)).  Specific intent, an element of first degree

murder in Louisiana, is a question of fact that "may be proven by direct evidence, such as

statements by a defendant, or by inference from circumstantial evidence, such as a

defendant's actions or facts depicting the circumstances." State v. Morgan, 119 So.3d 817,

822 (La. App. 1st Cir. 2013).

      A claim of insufficient evidence presents a mixed question of law and fact.  Perez,

529 F.3d at 594; Maes v. Thomas, 46 F.3d 979, 988 (10th Cir. 1995).  Therefore, this court

must examine whether the state courts' denial of relief was contrary to or an unreasonable

application of the foregoing United States Supreme Court precedent.

      Hankton was charged with and convicted of the first degree murder of 76-year-old

Henry Barber.  Under Louisiana law, first degree murder is the killing of a human being

when the offender has a specific intent to kill or to inflict great bodily harm upon a victim who is under the age of 12 or 65 years of age or older.  La. Rev. Stat. §14:30(A)(5).

Specific criminal intent "is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act."  La. Rev. Stat. §14:10(1).  Under Louisiana law, specific intent need not be proven directly but may be inferred from the actions of the defendant and the circumstances surrounding those actions.  State v. Tate,  851 So.2d 921, 930 (La. 2003) (citing State v. Brooks, 505 So.2d 714, 717 (La. 1987)); State v. Cummings, 771 So.2d 874, 876 (La. App. 1st Cir. 2000).

As determined by the Louisiana Fourth Circuit, the evidence, apparently found credible by the jury, established each of the elements of first degree murder.  It was uncontested at trial that Binika Hankton was with Henry Barber two days before Barber was found stabbed to death in his apartment on St. Andrew Street in New Orleans on September 17, 2009.[21]  The jury also heard sufficient evidence to establish that Hankton was the last person to see and speak with Barber; she had a long history of drug use; she purchased and used crack cocaine after leaving Barber's apartment on September 15, 2009; she depended on Barber for money at the time of Barber's death; she told Barber she was no longer willing to perform certain sexual acts that she felt were demeaning; in August 2009, Barber accused Hankton of stealing his apartment key and breaking into his closet;

---

[21] State Rec. Vol. 6 of 13, Trial Transcript, p. 114-15 (Narokia Butler), 8/30/11; State Rec. Vol. 8 of 13, Trial Transcript (continued), p. 122, 126 (Binika Hankton), 9/1/11.

and crime scene investigators found a knife missing that was from Barber's apartment at Hankton's home on September 21, 2009.[22]

The evidence at trial also established the following: Hankton met Barber in 1994 after buying drugs from him. In 2009, Hankton was working for Barber. She cooked, helped him run errands, cleaned and made telephone calls for Barber because he was deaf. Hankton also had a sexual relationship with Barber, for which she was paid.[23] On the morning of Tuesday, September 15, 2009, Hankton ran errands with Barber. They made plans to have his car fixed the next day. She brought Barber to the bank, and he gave her $100 of the $700 he withdrew. When they returned to Barber's apartment in the afternoon, Hankton spoke with Narokia Butler, the father of her daughter and a maintenance worker at Barber's apartment complex, about a UPS package. She also spoke with Martha Horton – the property manager and clerk at Central City Housing, the nonprofit that leased Barber's apartment – who stopped by Barber's apartment around 2:30 p.m. to check on the light fixtures attached to Barber's phone and doorbell.[24]

Hankton testified that she fixed Barber spaghetti and red gravy with meatballs for dinner. She testified that after vacuuming Barber's living room, she was putting away dishes in the kitchen and she backed into Barber, who cut himself in the neck with an

---

[22] State Rec. Vol. 7 of 13, Trial Transcript (continued), pp. 87-88 (Detective Desmond Pratt), 195 (Sergeant Daniel McMullen), 269-73 (Sherman Gillum), 285-89 (Agent Lindsay Zinna), 8/31/11; State Rec. Vol. 8 of 13 at pp. 32 (Michelle Patrice Dawson), 105, 111-12, 134-35, 165-70, 174-76 (Hankton).

[23] State Rec. Vol. 8 of 13 at pp. 104-06, 110, 119-20 (Hankton).

[24] State Rec. Vol. 6 of 13 at pp. 114-15, 120 (Butler), 226-32 (Martha Horton); State Rec. Vol. 8 of 13 at pp. 129; (Hankton).

object he was using to pull his neck hairs.  She asked Barber, "Are you okay?"  Barber responded that he was fine, but Hankton saw blood on his hands.  Barber then lay down in his bedroom, after telling Hankton that he was not feeling well, while Hankton made calls in the living room.  Before leaving for the day, Hankton asked Barber for money for her cab fare, and she told him to lock the door behind her as she left.  She testified that as she was leaving his apartment, Barber was getting up to lock the door.[25]

Hankton took a taxi to Sherman Gillum's house after she left Barber for the evening. She and Gillum had a close personal relationship at the time, and Hankton called Gillum from Barber's apartment at around 3:30 p.m. to say that she wanted to finish cleaning his house.[26]  After cleaning and spending time with Gillum, Hankton asked Gillum to take her uptown to a house on St. Andrew Street, where she purchased drugs.  At the end of the night, Gillum brought Hankton home to Elizardi Street in Algiers.[27]

The jury heard testimony that Hankton called and spoke with four different people about Barber's well-being and whereabouts on September 16, 2009.  Martha Horton received a phone call and voice message from Hankton, around 5:30 a.m., stating that she was trying to check on Barber.[28]  Around noon, Hankton went to August Alexander's apartment to ask if he had seen Barber.  Alexander lived in the same apartment complex

---

[25] State Rec. Vol. 8 of 13 at pp. 122-33 (Hankton).

[26] State Rec. Vol. 7 of 13 at p. 267, 281 (Gillum); State Rec. Vol. 8 of 13 at pp. 132-33 (Hankton).

[27] State Rec. Vol. 7 of 13 at pp. 271-74 (Gillum); State Rec. Vol. 8 of 13 at pp. 134-35 (Hankton).

[28] State Rec. Vol. 6 of l3 at pp. 226-32 (Horton).

as Barber, and he delivered Barber's paper daily.[29]  Officer Chris Harris was dispatched to Barber's apartment at approximately 6:30 p.m. to respond to a call that Hankton made expressing concern for Barber's well-being.  The apartment was locked, so Hankton and Officer Harris walked around Barber's apartment, knocked on the door and shined a flashlight into the windows.  While looking into the kitchen window, Officer Harris noted several red stains on the floor, which he presumed were from the spaghetti Hankton said Barber was cooking the night before.  Officer Harris called the apartment management and left a message requesting keys to Barber's apartment, and Hankton drove to several different residences in search of a key.  During their almost four hours together Hankton never mentioned that she backed into Barber, and that Barber stabbed himself in the neck.[30] Later in the evening, Jeanette Ortiz, a longtime acquaintance of Hankton's and the mother of Barber's son, received a call from an emotional Hankton who had not heard from Barber.  The next time she called Ortiz, Hankton was crying and saying that Barber was dead.[31]

On the morning of September 17, 2009, Officer Jovan Washington was dispatched to Barber's apartment at 8:50 a.m. to conduct a "well being check."  Officer Washington was unable to gain entry into Barber's apartment so he called Stanley Myers, the executive

---

[29] Id. at pp. 140-42 (Alexander); State Rec. Vol. 8 of 13 at p. 142 (Hankton).

[30] State Rec. Vol. 7 of 13 at pp. 170-76 (Officer Chris Harris); State Rec. Vol. 8 of 13 at pp. 143-44 (Hankton).

[31] State Rec. Vol. 6 at pp. 47-51 (Jeanette Ortiz); State Rec. Vol. 8 of 13 at pp. 108-09 (Hankton).

director of Central City Housing, and instructed him to bring keys to the apartment.[32]
Around the same time that morning, Hankton called Narokia Butler, in an effort to contact
Myers and get into Barber's apartment.[33]   Myers called Hankton, in response to the
message Hankton left with Horton on September 16, 2009, to say that there was nothing
he could do about Barber's disappearance.   Myers then received a call from the police
saying that Barber was missing.   When Myers arrived at work he attempted to open
Barber's door with the keys kept in the apartment complex office, but the keys did not fit.[34]

The testimony and evidence established that Barber's apartment had two doors, and
both doors were locked when Myers arrived on September 17, 2009.   There was an iron
gate door on the outside of the apartment and a wooden door that led into the apartment.
The jury was informed that the outside iron door could not be locked from the inside once
the wooden door was locked.   A person leaving the apartment would need a key to first
lock the wooden door and a key to next lock the iron door from the outside.[35]   Myers had
Pop-A-Lock open Barber's door, then he and Butler entered the apartment to find Barber's
lifeless body on the bed.[36] The jury was shown a schematic drawing of Barber's apartment,

---

[32] State Rec. Vol. 6 of 13 at p. 32-34 (Officer Jovan Washington), 60 (Stanley Myers).

[33] Id. at pp. 122-23 (Butler).

[34] Id. at pp. 68-69 (Myers).

[35] Id. at pp. 63-64, 102 (Myers), 141 (Alexander).

[36] Id. at pp. 69-71 (Myers); pp. 123-24 (Butler).

which included dots marking where blood was found, and Myers testified that he remembered seeing drops of blood outside of the kitchen area.[37]

The testimony established that Hankton did not appear at the crime scene at any point after Barber's body was discovered.[38] Detective Greg Hamilton, a detective with the New Orleans Police Department's homicide section, was the first homicide detective to arrive on the scene. He interviewed Myers, and Myers gave him Hankton's number.[39] Butler called Hankton to tell her that Barber was dead, and she asked Butler to give her a ride to the scene. Butler did not give Hankton a ride but stayed at the apartment complex.[40] Alexander called Hankton on September 18, 2009 to ask if she had stopped by Barber's that day, and she responded that she did not have time.[41]

Hankton eventually received a call from Detective Hamilton, and she agreed to help with the investigation and to be driven to the homicide office with her children.[42] The testimony established that Hankton gave three oral statements and one videotaped statement at the police station, over about a 12-hour period, and that she admitted to leaving

---

[37] Id. at p. 98 (Myers).

[38] Id. at pp. 74 (Myers), 127 (Butler); State Rec. Vol. 8 of 13 at pp. 30 (Detective Desmond Pratt), 46 (Maureen Roussell), 147-48.

[39] State Rec. Vol. 6 of 13 at at pp. 156, 159 (Detective Greg Hamilton).

[40] Id. at pp. 125-27 (Butler).

[41] Id. at p. 148 (Alexander).

[42] Id. at pp. 156-160 (Detective Hamilton); State Rec. Vol. 8 of 13 at p. 148 (Hankton).

Barber alone and bleeding in his apartment on September 15, 2009.[43]  In her first statement to Detectives Hamilton and Desmond Pratt, Hankton did not mention that Barber stabbed himself when she accidentally bumped into him, that she had purchased and used crack cocaine after leaving Barber's apartment on September 15, 2009, or that she had a sexual relationship with Barber.  She focused instead on her role as Barber's caretaker, and she outlined where she was and what she did on September 15, 16 and 17, 2009.[44]  It was only during her second interview that Hankton admitted to using crack cocaine.[45]  In her third interview, Hankton said she would tell the truth.  She stated that she backed into Barber, he stabbed or cut himself and she saw him bleed.  <u>At this point, the detectives Mirandized Hankton and stopped the interview</u>.  After interviewing Hankton's boyfriend, to whom she told the same story, the detectives took Hankton into an interview room and videotaped her statement.[46]

On September 21, Sergeant Daniel McMullen and Detectives Ryan Aucoin and Pratt, all with homicide division of the New Orleans Police Department, participated in the execution of a search warrant at Hankton's Elizardi Street residence.  They found a savings

---

[43] State Rec. Vol. 6 of 13 at pp. 191-93 (Detective Hamilton); State Rec. Vol. 7 of 13 at pp. 31-33 (Detective Pratt).

[44] State Rec. Vol. 6 of 13 at pp. 164, 191-92 (Detective Hamilton); State Rec. Vol. 7 of 13 at p. 31 (Detective Pratt); State Rec. Vol. 8 of 13 at p. 151 (Hankton).

[45] State Rec. Vol. 6 of 13 at pp. 164-66, 193 (Detective Hamilton); State Rec. Vol. 7 of 13 at p. 32 (Detective Pratt).

[46] State Rec. Vol. 6 of 13 at pp. 165-166, 193-95 (Detective Hamilton); State Rec. Vol. 7 of 13 at pp.32-34 (Detective Pratt); State Rec. Vol. 8 of 13 at pp. 151-52 (Hankton).

and withdrawal book under Hankton's mattress and a Louisiana identification card in an alcove closet, both in Barber's name.  In the kitchen, they found one knife inside of a knife block set that had a different handle than the other knives.[47]  The evidence and testimony established that the knife found in the butcher block at Hankton's home was a direct replica of the one knife missing from a four-knife set found in Barber's apartment.[48]  The testimony and evidence established that Troy Dickerson – a forensic examiner with the New Orleans Police Department's crime lab who was qualified at trial as an expert in chemical analysis and the process and examination of latent prints – examined a stainless steel knife with a wooden handle and found that the knife was negative for fingerprints. He testified, however, that any latent fingerprints could be smudged or ruined by washing, wiping or smearing the item.[49]

Testimony revealed that Barber died from 21 stab wounds, not a single nick on his neck.  The jury was shown pictures of Barber's body, including photographs of stab wounds to his neck and arms.[50]  The jury also saw pictures of blood splatters in Barber's apartment on a beige shirt draped over a chair in his living room, the inside door of the apartment, the floor and wall leading from the kitchen into the hallway, the wall between the hallway closet and the bathroom, the hallway floor and the closet door.  The evidence

---

[47] State Rec. Vol. 6 of 13 at pp. 206-10, (Detective Ryan Aucoin); State Rec. Vol. 7 of 13 at pp. 97 (Detective Pratt), 187, 193, 196 (Sergeant Daniel McMullen).

[48] State Rec. Vol. 7 of 13 at pp. 87-88 (Pratt), p. 192-95 (Sergeant McMullen).

[49] Id. at pp. 200, 203, 210-15 (Troy Dickerson).

[50] Id. at pp. 13-14, 156, 162 (Detective Pratt).

established that the hallway closet was ransacked, with clothes strewn across the floor and an ice chest in the hallway, but there were no signs of forced entry.[51]

The State presented sufficient evidence for a reasonable jury to find that Hankton had specific intent to kill or inflict great bodily harm upon Barber.  A reasonable jury could have concluded from the evidence that Hankton murdered Barber by stabbing him repeatedly with a knife.  The evidence and testimony established that Hankton was a frequent crack cocaine user and she depended on Barber for money.[52]  She was the last person known to have been in the apartment with Barber.  One of the other women who worked for Barber, Michelle Patrice Dawson, testified that Barber did not normally trust his lady friends to help him with his finances, but he trusted Hankton.  She also stated that there was growing distrust between Barber and Hankton because Barber believed Hankton had stolen his apartment key.[53]

The evidence and testimony established that a note, written in Barber's hand and signed August 24, 2009, accused Hankton of stealing his apartment key to break in and steal clothing, money, medication and other items from his locked closet.  He also requested that Hankton be drug tested and put back in jail.  Hankton identified another note, written in her hand in one of the notebooks she used to communicate with Barber, in which

---

[51] State Rec. Vol. 6 of 13 at pp. 199-205 (Detective Aucoin).

[52] State Rec. Vol. 7 of 13 at p. 285 (Agent Zinna); State Rec. Vol. 8 of 13 at pp. 111-12, 178 (Hankton).

[53] State Rec. Vol. 8 of 13 at pp. 21, 32-33 (Michelle Patrice Dawson).

she stated that she was no longer willing to perform certain sexual acts that she felt were demeaning.[54]

The jury heard and apparently found credible the testimony of Hankton's aunt, Theresa Keller Joseph, who identified a voice recording of a call between Hankton and Hankton's grandmother (Joseph's mother).  Joseph identified Hankton's voice, trying to convince her grandmother during the call to "Let them know that those are the knives that have been in [your] house."  Joseph also identified her own voice in the background of the call, saying to her mother, "You don't have to remember nothing," and "I'm not lying for anybody."  In response, Hankton said, "Tell Theresa to shut up."[55]

I find that the State presented sufficient evidence for a reasonable jury to conclude that each element of first degree murder was established.  Barber was repeatedly stabbed to death.  The police located the knife that was missing from Barber's apartment in the butcher block at Hankton's residence.  In a call to her grandmother, Hankton was recorded pleading with her grandmother to tell the police that the knives in the butcher block had always been there.  The police also found Barber's savings and withdrawal book and Louisiana identification card in Hankton's room.  The jury was aware of many other factors undermining Hankton's credibility, including but not limited to her frantic calls to various friends, neighbors and the police between September 15 and 17, 2009, searching for news of Barber's whereabouts, and her inconsistent statements to the police concerning the

---

[54]  State Rec. Vol. 8 of 13 at pp. 165-70, 173-76 (Hankton).

[55]  Id. at pp. 84-85 (Theresa Keller Joseph).

nature of her relationship with Barber and her explanation of what occurred on September 15, 2009.

Under these circumstances, I find that a rational trier of fact, after viewing the evidence in the light most favorable to the prosecution, could find beyond a reasonable doubt that Hankton had the specific intent to kill 76-year-old Barber or to inflict great bodily harm.  The state courts' denial of relief on this claim was not contrary to and does not represent an unreasonable application of Supreme Court precedent to the facts of this case.

(B)     EFFECTIVE ASSISTANCE OF COUNSEL

Hankton argues that her trial counsel rendered ineffective assistance because he moved for change of venue "at an inappropriate time" and was instructed by the trial judge to re-urge the motion after voir dire but failed to do so."[56]  She asserts that this failure subjected her "to unfair prejudices by jury members who were familiar with the Hankton (her maiden) name."[57]

Hankton asserted these claims on post-conviction review in the state courts.  The state trial court issued the last reasoned opinion on this claim, finding that Hankton failed to establish a basis for relief under Strickland v. Washington, 466 U.S. 668 (1984).  See Ylst, 501 U.S. at 802; Wilson, 2018 WL 1800370, at *3.

---

[56] Record Doc. No. 1 at p. 6.

[57]     Id. Telly Hankton and others with the last name Hankton have been prosecuted and convicted, including in this court, of criminal offenses, including murder and organized drug dealing. See, e.g., United States v. Hankton, C.A. No. 12-01, 2016 WL 4487744 (E.D. La. Aug. 25, 2016).

The standard for judging performance of counsel was established in Strickland, in which the Supreme Court established a two-part test for evaluating claims of ineffective assistance of counsel, requiring petitioner to prove both deficient performance and resulting prejudice. Strickland, 466 U.S. at 687. The Supreme Court first held that "the defendant must show that counsel's representation fell below an objective standard of reasonableness." Id. at 688. Second, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694; United States v. Kimler, 167 F.3d 889, 893 (5th Cir. 1999).

In deciding ineffective assistance of counsel claims, this court need not address both prongs of the conjunctive Strickland standard, but may dispose of such a claim based solely on a petitioner's failure to meet either prong of the test. Kimler, 167 F.3d at 892-93. A habeas corpus petitioner "need not show that 'counsel's deficient conduct more likely than not altered the outcome in the case.' But it is not enough, under Strickland, 'that the errors had some conceivable effect on the outcome of the proceeding.'" (citation omitted) Motley v. Collins, 18 F.3d 1223, 1226 (5th Cir. 1994) (quoting Strickland, 466 U.S. at 693); Harrington, 562 U.S. at 112 (Strickland requires a "substantial" likelihood of a different result, not just "conceivable" one.)

On habeas review, the United States Supreme Court has clarified that, under Strickland, "[t]he question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." Harrington, 562 U.S. at 105 (quoting Strickland, 466

- 24 -

U.S. at 690).  The <u>Harrington</u> Court went on to recognize the high level of deference owed

to a state court's findings under <u>Strickland</u> in light of the AEDPA:

> The standards created by <u>Strickland</u> and § 2254(d) are both "highly
> deferential," and when the two apply in tandem, review is "doubly" so.  The
> <u>Strickland</u> standard is a general one, so the range of reasonable applications
> is substantial.  Federal habeas courts must guard against the danger of
> equating unreasonableness under <u>Strickland</u> with unreasonableness under §
> 2254(d).  When § 2254(d) applies, the question is not whether counsel's
> actions were reasonable.  The question is whether there is any reasonable
> argument that counsel satisfied <u>Strickland</u>'s deferential standard.

(citations omitted) <u>Harrington</u>, 562 U.S. at 105.

Thus, scrutiny of counsel's performance under § 2254(d) is "doubly deferential."

<u>Cullen v. Pinholster</u>, 563 U.S. 170, 190 (2011) (quoting <u>Knowles</u>, 556 U.S. at 123).  This

court must therefore apply the "strong presumption" that counsel's strategy and defense

tactics fall "within the wide range of reasonable professional assistance."  <u>Strickland</u>,

466 U.S. at 689.

Federal habeas courts presume that litigation strategy is objectively reasonable

unless clearly proven otherwise by the petitioner.  <u>Id.</u>, 466 U.S. at 689; <u>Geiger v. Cain</u>, 540

F.3d 303, 309 (5th Cir. 2008); <u>Moore v. Johnson</u>, 194 F.3d 586, 591 (5th Cir. 1999).  In

assessing counsel's performance, a federal habeas court must make every effort to

eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's

challenged conduct, and to evaluate the conduct from counsel's perspective at the time of

trial.  <u>Strickland</u>, 466 U.S. at 689; <u>Neal</u>, 286 F.3d at 236-37; <u>Clark v. Johnson</u>, 227 F.3d

273, 282-83 (5th Cir. 2000), <u>cert. denied</u>, 531 U.S. 1167 (2001).  Tactical decisions when

supported by the circumstances are objectively reasonable and do not amount to unconstitutionally deficient performance. Lamb v. Johnson, 179 F.3d 352, 358 (5th Cir. 1999), cert. denied, 528 U.S. 1013 (1999) (citing Rector v. Johnson, 120 F.3d 551, 564 (5th Cir. 1997) and Mann v. Scott, 41 F.3d 968, 983-84 (5th Cir. 1994)).

The issue of ineffective assistance of counsel is a mixed question of law and fact. Clark v. Thaler, 673 F.3d 410, 416 (5th Cir. 2012); Woodfox v. Cain, 609 F.3d 774, 789 (5th Cir. 2010). Thus, under the AEDPA, the question before this court is whether the state courts' denial of relief was contrary to or an unreasonable application of United States Supreme Court precedent.

To establish prejudice under Strickland, Hankton must "bring forth evidence demonstrating that there is a reasonable probability that the trial court would have, or at least should have, granted a motion for change of venue if [defense] counsel had presented such a motion to the court." Meeks v. Moore, 216 F.3d 951, 961 (11th Cir. 2000). Hankton cannot sustain her burden of proof.

Under Louisiana law, a trial court must change the venue of a prosecution "when the applicant proves that by reason of prejudice existing in the public mind or because of undue influence . . . a fair and impartial trial cannot be obtained in the parish where the prosecution is pending." State v. Bordelon, 33 So.3d 842, 866 (La. 2009) (citing La. Code Crim. P. art. 622). The court must  consider whether "the prejudice, the influence, or the other reasons are such that they will affect the answers of jurors on the voir dire examination or the testimony of witnesses at the trial." Id. However, "the defendant must

prove more than mere public knowledge or familiarity with the facts of the case to be entitled to have his trial moved to another parish; rather, the defendant must show the extent of prejudice in the minds of the community as a result of such knowledge or exposure to the case before trial." Bordelon, 33 So.3d at 866; State v. Frank, 803 So.2d 1, 14-15 (La. 2001).

The Fourteenth Amendment protects a defendant's Sixth Amendment right to have his case decided by an impartial jury, Irvin v. Dowd, 366 U.S. 717, 722 (1961), and a defendant may request a "transfer of the proceeding to a different district . . . if extraordinary local prejudice will prevent a fair trial – a basic requirement of due process." Skilling v. United States, 561 U.S. 358, 378 (2010) (quotations and citation omitted.) The Supreme Court has stated that an impartial jury, however, is not one in which the jurors must be totally ignorant of the facts and issues involved in the case. Irvin, 366 U.S. at 722. "To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." Id. at 723.

Hankton offers no evidence to establish prejudice under Strickland. She fails to demonstrate that any "outside influence," including any juror's familiarity with her last name, was so pervasive and inherently prejudicial that an unbiased jury pool was not assembled. On the contrary, the state court record establishes that any potential prejudice

was precluded by the thorough voir dire process and the procedural exercise of cause and peremptory challenges by the state trial court and counsel.

The transcript of jury voir dire in this case reveals that defendant was represented by public defender Stuart Weg, who filed a motion for change of venue on August 23, 2011. [58] During a motion hearing on August 26, 2011, the court denied the motion as premature, even after the prosecution joined in. The court stated that, "should it become an issue that we need to address the possibility of a change of venue again, I'll be happy to reconsider it. But I do find that granting it now, before we even know what the jury members are going to say, is premature." Weg objected.[59]

Voir dire questions to the first panel regarding the Hankton name are at pp. 145-68 of the transcript. After Weg asked members of each panel to raise their hands if they had heard of Telly Hankton, all questions regarding the Hankton name to prospective jurors who had raised their hands were conducted at individual bench conferences. The court took over the individual questioning from defense counsel at p. 155, over Weg's objection.

Challenges for cause as to the first panel are at pp. 197-211 and 212-13. Peremptory challenges are at pp. 211-13. Voir dire questions to the second panel regarding the Hankton name appear at pp. 312-26, with challenges for cause at pp. 353-63, all of which were unrelated to the Hankton name. Peremptory challenges are at pp. 364-66. Voir dire

---

[58] State Rec. Vol. 3 of 13.

[59] State Rec. Vol. 11 of 13, at pp. 14-15 of motion hearing transcript.

questions to the third panel regarding the Hankton name are at pp. 435-44, with challenges for cause at pp. 455-62 and peremptory challenges at p. 463.  Challenges as to selection of two alternate jurors are at pp. 464-67.

At pages 156-58, 168, 363-64 and 458, Weg objected to the court's having prohibited him from questioning potential jurors regarding their subjective answers about whether they could be impartial and on other grounds applicable from paragraph 20 of his motion for sequestered voir dire.  All of these objections were noted and/or overruled.

All prospective jurors who raised a hand in response to the question whether they had heard of Telly Hankton were questioned individually about how they knew the name, whether they had heard of or knew Binika Hankton, whether they had formed any opinion of her from their knowledge of Telly Hankton, and whether they believed they could be fair and impartial to Binika Hankton if they were selected as a juror.

The court excused seven prospective jurors based on their answers to these questions.  The State challenged one for cause, which was denied, then used peremptory challenges to excuse that one and two other prospective jurors who had recognized the Hankton name.  Defendant challenged two prospective jurors for cause based on their answers regarding the Hankton name.  Both challenges were denied.  One of those two was later excused by the State on a peremptory challenge, and defendant used one of her peremptory challenges to excuse the other.  Defendant struck three other prospective jurors from this group on peremptory challenges.

At pp. 168 and 197, prospective jurors Tasha Hall, Trina Scott and Adeyemi Talabi (Nos. 12, 13 and 24 in the first panel) were excused for cause by the court after they answered these questions.  When Ms. Hall was asked whether she had formed any opinion as to Binika Hankton based on having heard the name Hankton on the news, she responded at p. 161:  "I can't say it wouldn't possibly come into my thinking."

At pp. 163-64, Ms. Scott said she recognized the Hankton name from the news and through a couple of her in-laws.  She said that she did not know the Hanktons, "but my people do, my cousins."  Scott stated that she had not heard of Binika Hankton, but "I don't like them from what I have heard" and she did <u>not</u> think she could be fair and impartial regarding Binika Hankton in this case.

At p. 167, Mr. Talabi said he recognized the Hankton name regarding "someone on Claiborne that got shot."  When asked whether he had formed any opinion of Binika Hankton based on what he had heard on the news as to the Hankton name, he replied at pp. 167-68:  "You can't help yourself but think, from reading the stuff or following it, that the background is violent that the family has."

At pp. 197-98, the State challenged Tracy Comeaux, Juror No. 16, for cause because, according to the prosecuting attorney, Ms. Comeaux had said she is related to and two family members are married into the Hankton family.  This apparently occurred during a bench conference that was <u>not</u> recorded at p. 54.  At p. 145, Ms. Comeaux said she does not know Binika Hankton personally, but knows her family.  The prosecuting attorney challenged Ms. Comeaux because the attorney did not believe that Ms. Comeaux could

deliberate properly and return a guilty verdict, knowing that she has to go home to the Hankton family.  Weg asked for additional voir dire regarding Ms. Comeaux's knowledge of the family.  The court denied the challenge because Ms. Comeaux said she does not know and has no opinion of Binika Hankton.  Ms. Comeaux was later excused by the State's peremptory challenge at p. 364.

At pp. 210-11, Weg challenged Ms. Verlina Robichaux, Juror No. 14, for cause because she said she was friends with one of the Hankton family who was killed.  Weg argued:  "I don't think we know enough about the relationship regarding friends with one of the Hankton's deceased – I don't remember it if was a friend of the Hanktons who was deceased."  This challenge was denied, but the State later used a peremptory challenge to strike Ms. Robichaux at p. 463.

The State used a peremptory challenge at p. 212 to excuse Diondra Lewis, Juror No. 23, who had recognized the Hankton name from the news and said that "some of the Hanktons attend my church."  Tr. at p. 166.

The defense used a peremptory challenge at p. 212 to strike Edward Hemard, Juror No. 9, who did not recognize the name Telly Hankton, but had heard or read reports of possible witness tampering and perjury at the recent trial.  Tr. at p. 147.  At p. 212, the defense struck Juror No. 6, Ms. Mena, who had heard of Telly Hankton in the news, did not know the name Binika Hankton, but said she might form an opinion about defendant if she knew how they are related.  Ms. Mena asked whether she could be told if they are related.  Tr. at pp. 156-57.

At p. 212, the defense struck Mr. Johnson, Juror No. 5, who was the last juror questioned directly by Weg about the Hankton name before the court took over the individual questioning. Johnson said he had heard of Telly Hankton in the news, but had no feelings or opinions about Binika Hankton. Weg then asked Johnson whether he had "any sense of whether Binika Hankton would be definitely guilty, probably guilty, probably not guilty, not guilty?" Johnson replied, "I cannot rate that." Tr. at pp. 154-55.

During bench questioning of the second panel at pp. 314-15, the court struck Ms. Williams, Juror No. 28. She said she knew the name Telly Hankton from the news and that "I have no opinion about Binika Hankton, but it would be in the back of my mind. I would want to know their relationship, I could be fair and impartial without knowing it, but I would not be comfortable."

Weg objected at p. 317 that Ms. Thomas had not been excused by the court for similar statements. The court responded that Ms. Thomas had said she could be fair and impartial. Ms. Thomas stated at pp. 312-13 that she recognized Telly Hankton from the neighborhood, had heard about him and had seen him a few times. Ms. Thomas said she did not know, had never seen and had no opinion about Binika Hankton, and that she could be fair and impartial. At the court's instruction, Weg at p. 314 made his objection continuing as to being unable to get real objective information or followup on what jurors know or have heard, how they know it and their opinions.

The court excused Kishauna Ross, Juror No. 50, because she said she has family members who associate with Binika Hankton's family, she did not want to be involved and she was scared.  Tr. at pp. 435-36, 455.

The State's and defendant's challenges for cause of the second panel at pp. 353-63 were all unrelated to the Hankton name.  At p. 364, the State exercised a peremptory challenge against Ms. Badon, Juror No. 42, who recognized Telly Hankton's name from the newspaper, but did not recognize Binika Hankton's name.  Ms. Badon said she had no opinion about Binika Hankton and "I know some really great Hanktons."  Tr. at pp. 323-24. Defendant's two peremptory challenges were for jurors who had not recognized the Hankton name.

The court excused Mr. Schwartz, Juror No. 61, during voir dire of the third panel at pp. 441-42 and 457-58.  Mr. Schwartz had heard about Telly Hankton in the news and said that it is "definitely a name that stands out for murders and trials."  Although he did not recognize Binika Hankton's name, he said he had an opinion about her.  "If she is from that same family, I believe they have an issue with this type of crime and I would probably not be for the defense in this type of case."

The court also excused prospective juror Ms. Simon at pp. 442-44 because she used to work for a man who owns a bar and who was recently retaliated against for the case that just ended.  She said she lost her job as a result of her employer being shot and having a connection with the Hanktons. Although she did not know Binika Hankton, Ms. Simon

would have an opinion about defendant if she is related to Telly Hankton's family, which she said is not a good family.

The State's challenges for cause at pp. 459-60 and defendant's challenges for cause at pp. 461-62 were not related to the Hankton name. At p. 464, defendant used a peremptory challenge to strike an alternate prospective juror, David Kepper. At pp. 465-66, Weg stated that he had meant to strike Mr. Kepper for cause, but did not bring it up previously because the court said it would handle Mr. Kepper in chambers. The court denied the challenge for cause and Weg then exercised his peremptory challenge to strike Kepper. At pp. 438-40, Mr. Kepper said he had heard about Telly Hankton in the news. He stated that he did not recognize Binika Hankton's name, had not heard anything about her and had no opinion about her. He believed he could be fair and impartial, "although it is a scary proposition from what I have heard of the other Hankton, that he's a powerful person on the wrong side, and I don't know how large the circle is."

I find that the transcript establishes that both counsel and the court thoroughly addressed all aspects of any prejudice that might have existed in the minds of any prospective jurors based on defendant's last name in an entirely appropriate way. Potential jurors who indicated any bias difficulty arising from defendant's last name were eliminated from the panel, either for cause or by use of peremptory challenges. It is clear that at the end of voir dire and jury selection, no reasonable basis for a potentially successful motion to change venue existed. Counsel does not act deficiently in failing to urge a meritless argument. See Smith v. Puckett, 907 F.2d 581, 585 n.6 (5th Cir. 1990) ("Counsel is not

deficient for, and prejudice does not issue from, failure to raise a legally meritless claim."); Koch v. Puckett, 907 F.2d 524, 530 (5th Cir. 1990) (concluding that "counsel is not required to make futile motions or objections."). There was nothing more required of counsel. See United States v. Gibson, 55 F.3d 173, 179 (5th Cir. 1995) (counsel's failure to file motion to suppress based on faulty search warrant affidavit was not deficient performance because counsel is not required "to file meritless motions"); Williams v. Cain, Nos. 06-0224, 06-0334, 2009 WL 1269282, at *12 (E.D. La. May 7, 2009) ("Counsel is not considered ineffective for failing to assert a baseless and frivolous motion."). Hankton's claim concerning her counsel's performance in connection with any change of venue motion provides no basis for federal habeas corpus relief.

(C)     USE OF INCULPATORY STATEMENTS

Hankton argues that her inculpatory statements were obtained in violation of her constitutional rights under the Fifth and Fourteenth amendments, but were nevertheless used against her at trial. She makes no argument that her statements were coerced or involuntary in any way. Instead, she asserts that the statements were "taken out of context" and that the testimony of the investigating officers concerning the timing of the Miranda warnings they gave her differs from the account they gave at the May 2010 state court hearing on her motion to suppress the statements.[60] Specifically, she argues that the

---

[60] Record Doc. No. 1 at p. 8.

interrogating "detectives failed to timely advise her of her constitutional rights per <u>Miranda v. Arizona</u>, 384 U.S. 436 . . . (1966)." <u>Id.</u> at p. 24.

In its response, the State does not address Hankton's Fifth Amendment <u>Miranda</u> argument.  Instead, it characterizes Hankton's argument in this regard exclusively as a Fourth Amendment claim and asserts that it is barred from review in this court under <u>Stone v. Powell</u>, 428 U.S. 465 (1976).[61]  The State asserts that because Hankton's counsel filed a pretrial motion to suppress and provided a full evidentiary hearing before denying it, all of which was reviewed on pretrial appeal, <u>Stone</u> precludes further review by this court.

The State's conclusion in this regard is erroneous.  It is correct that in <u>Stone</u>, the Supreme Court held that "where the State has provided an opportunity for full and fair litigation <u>of a Fourth Amendment claim</u>, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at trial."  <u>Id.</u>, 428 U.S. at 494 (footnotes omitted).  However, the United States Supreme Court has "repeatedly declined to extend the rule in <u>Stone</u> beyond its original bounds."  <u>Withrow v. Williams</u>, 507 U.S. 680, 687 (1993).  Specifically, in <u>Withrow</u>, "[t]he Supreme Court . . . refused to apply <u>Stone</u> to bar collateral attacks based on <u>Miranda</u> violations."  <u>United States v. McGrew</u>, 397 F. App'x 87, 90-91 (5th Cir. 2010); <u>accord</u> <u>Cardwell v. Taylor</u>, 461 U.S. 571, 572-72 (1983) (federal courts are not barred from granting relief on collateral review for claims asserting use of defendant statements

---

[61] Record Doc. No. 15 at p. 6.

obtained in violation of the Fifth Amendment); <u>Otero v. Louisiana</u>, No. 12-1332, 2013 WL 6072716, at *6, n. 22 (E.D. La. Nov. 18, 2013) (Feldman, J. adopting report & recommendation of Shushan, M.J.) ("The Court notes that the <u>Stone</u> prohibition applies only to claims arising under the Fourth Amendment.  It does not, for example, extend to petitioner's claim that his conviction rests on statements obtained in violation of the Fifth Amendment and <u>Miranda</u> . . . .").  Thus, I will address the substance of Hankton's claim concerning the use at trial of her statements to police.

In this case, the record establishes that Hankton's statements were <u>not</u> obtained in violation of her constitutional rights and that they were therefore properly used against her at trial.  The constitutional propriety of the use of a defendant's statement to police is a mixed question of law and fact.  <u>Miller v. Fenton</u>, 474 U.S. 104, 112 (1985); <u>ShisInday v. Quarterman</u>, 511 F.3d 514, 522 (5th Cir. 2007) (citing <u>Miller</u>, 474 U.S. at 112).  A federal court on habeas review must respect the state court's determination as long as it was not "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court."  28 U.S.C. § 2254(d)(1); <u>Barnes v. Johnson</u>, 160 F.3d 218, 222 (5th Cir. 1998).  In doing so, a federal habeas court must afford a presumption of correctness to state courts' findings of fact if they are fairly supported by the record.  <u>Miller</u>, 474 U.S. at 117.  The state court's related factual determinations are presumed to be correct and are overturned only if they were based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d)(2); <u>Barnes</u>, 160 F.3d at 222; <u>see also</u>, <u>Miller</u>, 474 U.S. at 117.

Under Miranda, a statement made by a person in custody is inadmissible unless that person was informed that he has the right to have an attorney present during questioning, that he has the right to remain silent, and that anything that he says may be used against him.  Id., 384 U.S. at 444-45.  A person may waive these rights so long as the waiver is knowing and voluntary.  Moran v. Burbine, 475 U.S. 412, 421 (1986).  During custodial interrogation, "the right to have counsel present ... is indispensable to the protection of the Fifth Amendment privilege."  Miranda, 384 U.S. at 469.

The Louisiana Fourth Circuit correctly summarized the applicable federal constitutional law as follows:

> The obligation to provide Miranda warnings attaches only when a person is questioned by law enforcement after he has been taken "into custody or otherwise deprived of his freedom of action in any significant way." Miranda . . . 384 U.S. at 444 . . . . Custody is decided by two distinct inquiries: an objective assessment of the circumstances surrounding the interrogation to determine whether there is formal arrest or restraint on freedom of the degree associated with formal arrest; and, second, an evaluation of how a reasonable person in the position of the interviewee would gauge the breadth of his freedom of action. Stansbury v. California, 511 U.S. 318, 322 . . . (1994), citing California v. Beheler 463 U.S. 1121, 1125, . . . (1983) . . . .

State v. Hankton, 140 So.3d at 407.  Thus, a person is deemed in custody when she is formally arrested or when a reasonable person in the suspect's position would understand the situation to constitute a restraint on his freedom of movement that is consistent with the constraint typically associated with formal arrest.  United States v. Gonzales, 121 F.3d 928, 940 (5th Cir. 1997); United States v. Galberth, 846 F.2d 983, 986 n.1 (5th Cir. 1988); United States v. Bengivenga, 845 F.2d 593, 596 (5th Cir. 1988).  The test for determining

custody is an objective one, and the relevant inquiry is "how a reasonable person in the suspect's position would have understood his situation." Berkemer v. McCarthy, 468 U.S. 420, 422 (1984) (roadside questioning of motorist detained pursuant to routine traffic stop did not constitute custodial interrogation). The Fifth Circuit considers a number of factors in determining whether a person is "in custody," including the length, location and accusatory or non-accusatory nature of questioning, whether there was a restraint on her physical movement and whether the officers made any statements regarding her freedom to move or leave. United States v. Wright, 777 F.3d 769, 775 (5th Cir. 2015). The key issue is not what did the person think was happening to her "when she gave the damaging information, but what would the reasonable person have thought under the same circumstances. Bengivenga, 845 F.2d at 596.

The record in this case demonstrates that Hankton was not in custody at the time she made her statements before Miranda rights were administered, and that nothing about the receipt of her statements violated her Fifth Amendment rights.

As discussed above, after Barber's body was found on September 17, 2009, Hankton received a call from Detective Hamilton, and she agreed to help with the investigation and to be driven to the homicide office with her children.[62] The testimony established that Hankton gave three oral statements and one videotaped statement at the police station,

---

[62] State Rec. Vol. 7 of 13 at pp. 156-160 (Detective Hamilton); State Rec. Vol. 8 of 13 at p. 148 (Hankton).

intermittently over about a 12-hour period, and that she admitted to leaving Barber alone and bleeding in his apartment on September 15, 2009.[63]

Hankton alleges in her petition that the "trial testimony given by the investigating officers regarding the timing of <u>Miranda</u> warnings given to Petitioner materially differs from the account testified to at the hearing on her motion to suppress in May of 2010."[64] During the hearing on Hankton's motion to suppress, Detective Hamilton testified that he Mirandized Hankton after she said she was going to tell the truth.[65]  At trial, he said that Hankton was stopped after she said, "I'm vacuuming and I back into him and there is blood."  Detective Hamilton stated that Hankton was then advised of her rights and videotaped because her statement was "about to go in a different direction" because "we've got death, there is some injury to the neck."[66]  Detective Pratt testified at trial that he and Detective Hamilton quickly stopped the conversation when Hankton stated that she was going to tell the truth, and that she backed into Barber while vacuuming and he stabbed himself in the neck. "We then advised her of her <u>Miranda</u> rights at the point with the inculpatory statement," said Detective Pratt.[67]

---

[63] State Rec. Vol. 6 of 13 at pp. 191-93 (Detective Hamilton); State Rec. Vol. 7 of 13 at pp. 31-33 (Detective Pratt).

[64] Record Doc. No. 5 at p. 23.

[65] <u>State v. Hankton</u>, 140 So.3d at 417 (Jenkins, J., dissenting).

[66] State Rec. Vol. 6 of 13 at pp. 193-94 (Detective Hamilton).

[67] State Rec. Vol. 7 of 13 at p. 32 (Detective Pratt).

Despite the alleged inconsistencies, the testimony is clear that in her first statement to Detectives Hamilton and Desmond Pratt, Hankton did not mention that Barber stabbed himself when she accidentally bumped into him, that she had purchased and used crack cocaine after leaving Barber's apartment on September 15, 2009, or that she had a sexual relationship with Barber.  She focused instead on her role as Barber's caretaker, and she outlined where she was and what she did on September 15, 16 and 17, 2009.[68]  It was only during her second interview that Hankton admitted to using crack cocaine.[69]  In her third interview, Hankton stated that she backed into Barber, he cut himself and she saw him bleed.

Hankton was read her <u>Miranda</u> rights either after she said, "Okay, well, I'm going to tell you the truth.  I went and bought crack," or right after she started to explain that she backed into Barber while vacuuming and he cut himself.[70]  Hankton testified that she told Detective Hamilton about backing into and cutting Barber, "then he stopped me and was telling me something about me waiving my rights."[71]  After interviewing Hankton's

---

[68] State Rec. Vol. 6 of 13 at pp. 164, 191-92 (Detective Hamilton); State Rec. Vol. 7 of 13 at p. 31 (Detective Pratt); State Rec. Vol. 8 of 13 at p. 151 (Hankton).

[69] State Rec. Vol. 6 of 13 at pp. 164-66, 193 (Detective Hamilton); State Rec. Vol. 7 of 13 at p. 32 (Detective Pratt).

[70] State Rec. Vol. 8 of 13 at p. 150 (Hankton); State Rec. Vol. 6 of 13 at pp. 191-93 (Detective Hamilton).

[71] State Rec. Vol. 8 of 13 at p. 208 (Hankton).

boyfriend, to whom she told the same story, the detectives took Hankton into an interview room and videotaped her statement.[72]

The exact timing of when Hankton was read her Miranda rights is immaterial to this issue because Hankton was not "in custody" at any time during the 12 hours she spent at the police department homicide office.  Hankton was questioned four separate times in that 12-hour period, but she asserted at trial that she went to and remained at the police department homicide office voluntarily.  Detective Pratt testified that Hankton was free to leave because she was not a suspect, and when Hankton's aunt and uncle arrived to take her children home she stayed voluntarily to assist in the investigation.[73]  Hankton testified, "I told [the detectives] that I would cooperate with them, anything that I could do to help them, I would."  When asked why she continued to talk with the detectives, Hankton replied, "Because I had nothing to hide."[74]

Missouri v. Seibert, 542 U.S. 600 (2004), is inapplicable in this case because Hankton was not arrested before she arrived at the homicide office, and the detectives stopped Hankton to Mirandize her when she began to make what was beginning to sound like an inculpatory statement.  There was no testimony or other evidence that Hankton was physically restrained, or that she was told that she could not leave.  Hankton did not testify

---

[72] State Rec. Vol. 6 of 13 at pp. 165-166, 193-95 (Detective Hamilton); State Rec. Vol. 7 of 13 at pp.32-34 (Detective Pratt); State Rec. Vol. 8 of 13 at pp. 151-52 (Hankton).

[73] State Rec. Vol. 7 of 13 at pp. 102-03 (Detective Pratt).

[74] State Rec. Vol. 8 of 13 at p. 149 (Hankton).

that she felt restrained or coerced into giving any statement.  Detectives Hamilton and Pratt did not testify that the investigation was focused on Hankton while she was at the homicide office, and Hankton did not testify that the detectives accused her of murdering Barber. She was not arrested after she gave the videotaped statement.  A reasonable person in Hankton's position would have understood that her freedom of movement was not restricted, and her questioning by detectives was not the functional equivalent of a formal arrest.  Accordingly, Hankton was not "in custody," her statements were voluntary and the obligation to provide <u>Miranda</u> warnings did not attach at any time before her <u>Miranda</u> rights were provided to her by the police.

Essentially for the reasons provided by the Louisiana Fourth Circuit, Hankton has failed to demonstrate that her statements used against her at trial were obtained in violation of her constitutional rights. Hankton has not established that the state court's decision was contrary to or an unreasonable application of federal law.  Even concluding that the <u>Stone v. Powell</u> bar does not apply, she is not entitled to relief on this claim on the merits.

## **RECOMMENDATION**

For the foregoing reasons, Hankton's petition for habeas corpus relief is without merit.  Thus, **IT IS RECOMMENDED** that Hankton's petition for issuance of a writ of habeas corpus under 28 U.S.C. § 2254 be **DENIED** and **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14)

days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc) (citing 28 U.S.C. § 636(b)(1)).[75]

New Orleans, Louisiana, this _____29th_____ day of June, 2018.

JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE

---

[75]Douglass referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend the period to fourteen days.